Filed 7/13/22  P. v. Cordray CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KEVIN CORDRAY,<br><br>Defendant and Appellant. | F080514<br><br>(Kern Super. Ct. No. BF170827A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  David R. Zulfa, Judge.

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**<u>INTRODUCTION</u>**

Between 2013 and 2014, defendant Kevin Cordray lived with his girlfriend Crystal and her four daughters, S.M.,[1] C.D., A.D., and D.D.  The four girls later alleged defendant sexually abused them during this time.  On October 22, 2019, a jury convicted defendant of lewd or lascivious acts with S.M., a child under 14 years old (Pen. Code, § 288, subd. (a), count 1);[2] oral copulation of D.D., a child 10 years or younger (§ 288.7, subd. (b), count 2); lewd or lascivious acts with D.D., a child under 14 years old (§ 288, subd. (a), count 3); oral copulation of A.D., a child 10 years or younger (§ 288.7, subd. (b), count 5); and lewd or lascivious acts with A.D., a child under 14 years old (§ 288, subd. (a), count 6).[3]  As to counts 1, 3, and 6, the jury also found true defendant had been convicted in the present case of committing an offense specified in section 667.61, subdivision (c) against more than one victim.  The trial court subsequently sentenced defendant to an indeterminate term of 90 years to life.

On appeal, defendant contends the trial court prejudicially erred in instructing the jury with CALCRIM No. 1193 because the instruction impermissibly allowed the jury to use expert testimony regarding Child Sexual Abuse Accommodation Syndrome (CSAAS) as evidence the victim's testimony was true and therefore defendant is guilty. He further contends the erroneous instruction violated his right to due process because it lessened the prosecution's burden of proof.

We conclude CALCRIM No. 1193 is a correct statement of the law and properly instructs the jury on the limited use of CSAAS evidence in evaluating a victim's

---

[1] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials.  No disrespect is intended.

[2] All further statutory references are to the Penal Code unless otherwise stated.

[3] Prior to trial, the court granted the People's motion to dismiss count 4 in the furtherance of justice pursuant to section 1385.  For purposes of trial only, the trial court renumbered count 5 to count 4 and count 6 to count 5.  The verdict forms list the charges as counts 1 through 5.  The minute orders recording the verdict and sentence, and the abstract of judgment, correctly list the charges as counts 1, 2, 3, 5 and 6.

2.

believability and credibility.   We further conclude it was not reasonably likely the jury understood CALCRIM No. 1193 as allowing it to use CSAAS evidence for any other purpose.  (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.)  The instruction therefore was not prejudicial and did not violate defendant's right to due process.  Accordingly, we affirm.

## FACTS

During S.M.'s sixth grade year, S.M. and her sisters, C.D., A.D., and D.D. lived with their mother and defendant in Bakersfield, California.  S.M. subsequently went to live with her father in Washington State and, in October 2014, disclosed to a sheriff's deputy that defendant " 'had raped [her] or [she] was just imagining the whole thing, which [was] very doubtful.' "  Although S.M. did not disclose many specifics regarding the abuse, this disclosure resulted in the Bakersfield Police Department opening a sexual abuse investigation against defendant.  Although an investigation was opened, C.D., A.D., and D.D. chose to not speak with law enforcement.  It was not until 2017 that S.M. and her sisters, C.D., A.D., and D.D. fully disclosed sexual abuse by defendant.

**Prosecution-Case-In-Chief**

### *Conduct Involving S.M. (Count 1)*

S.M. was born in 2002 and was 17 years old at the time of the trial.  In 2013, S.M. was 11 years old and was living in Bakersfield, California with Crystal, defendant, C.D., A.D., and D.D.[4]  During this time, Crystal had a job working nights and slept during the day.  Often during the night, defendant was the only adult in the house.

In 2013, on the night before the first day of school, S.M. was sitting on Crystal's bed with defendant and her sisters, C.D. and D.D.  C.D. and D.D. were playing video games.  S.M. took A.D. to her bedroom and went back to Crystal's bed and got herself

---

[4] S.M. also mentioned she has a sister K.  K. did not report any allegations of abuse.

comfortable. After S.M. got into the bed, defendant rolled over and laid next to her. Defendant then got up, went to the bathroom, and came back to the same spot on the bed right next to S.M. Defendant then touched S.M. on her thighs, shorts, and vagina with his hands over and underneath her clothes and touched S.M.'s vagina underneath her clothes with his penis. Eventually, defendant performed an act of sexual intercourse. The whole incident lasted approximately one hour. S.M. suffered pain and the intercourse caused her to bleed. Eventually, defendant went back to the bathroom and S.M. ran to her room.

The following night, defendant went into S.M.'s room where C.D. was also sleeping. Defendant touched S.M.'s legs with his hands and then performed an act of digital penetration.

Additionally, a separate incident occurred on the living room couch. While S.M. was trying to sleep on the couch, defendant came in and touched her with his hands on her legs and vagina over and underneath her clothes.

Defendant touched S.M. inappropriately almost every night. Each time, defendant performed acts of digital penetration and intercourse. During these incidents, defendant also touched S.M. on her chest, shoulders, and face. Most of the time, defendant would lie next to S.M. on his side, directly behind her. Defendant touched S.M. on the chest and shoulders both over and underneath her clothes. He told S.M. she would be okay and that she was special. One morning, in the middle of S.M.'s sixth grade year, defendant gave S.M. money and told her it was because she had been good.

S.M. eventually told her best friend B.S. about the abuse. S.M. told B.S. defendant came into her room and did things to her. On one occasion, during her sixth grade year, B.S. observed defendant touching his genitals on the couch in the living room in front of herself and S.M. A.D. and D.D. were also in the room. On three to four separate occasions, B.S. observed defendant touch S.M.'s breasts and buttocks. On a separate occasion, B.S. wore a strapless dress and defendant tugged at it and tried to pull it down.

4.

Defendant touched S.M. inappropriately throughout her sixth-grade year. After S.M.'s sixth grade year, she moved in with her grandmother in Placerville, California. S.M. moved in with her grandmother because Crystal kicked S.M. out of the house for "getting in the way of [Crystal] and [defendant]." This occurred after S.M. told Crystal she did not trust defendant and that he made her feel uncomfortable.

S.M. then went to live with her father in Washington State. In October 2014, S.M. told her father "what [defendant] had done." Subsequently, S.M. spoke with a police officer after kids at school saw blood dripping down her leg. S.M. was bleeding because she cut herself with a razor blade on the arms, legs, and stomach. Initially, S.M. did not want to talk about the abuse because she thought "bad things" would happen to her. The abuse caused S.M. to lose weight, have difficulty sleeping, and it caused her to shave her head. S.M. gave more details about the abuse after C.D. disclosed abuse to a detective in Bakersfield, California in 2017.

### Conduct Involving D.D. (Counts 2 & 3)

D.D. was born in 2009 and was 10 years old at the time of trial. D.D. last saw defendant when she was five years old. D.D. testified defendant was "[a] bad man" and had done bad things to her and her sisters. Further, D.D. testified all those bad things happened while she was living in Bakersfield, California with Crystal, defendant, S.M., C.D., and A.D.

D.D. testified defendant took off all her clothes, made her lie in bed, and touched her everywhere. This happened at night while Crystal was at work. Defendant touched D.D. with his hands around her stomach and leg area and on her vagina underneath her clothes. Defendant also made D.D. perform an act of oral copulation and he told D.D. his penis was "chocolate." This happened between two to five times in Crystal's bedroom. Defendant would lay his head on the pillow, above D.D., while D.D. would lay on her stomach. Defendant would place her in that position. D.D. told Crystal about how defendant touched her, but Crystal did not believe her.

5.

### *Conduct Involving A.D. (Counts 5 & 6)*

A.D. was born in 2010 and was eight years old at the time of the trial. When A.D. was approximately three to four years old, she lived with her three sisters, Crystal, and defendant in Bakersfield, California. One night when Crystal was working, defendant placed his penis in A.D.'s mouth [performed an act of oral copulation on her] and told her it was a chocolate lollipop. Defendant picked A.D. up out of bed and placed her in Crystal's bed in the other room. A.D. lay down on her back with her eyes closed. A.D. tried to get away, but defendant got on top of her and placed his hands on her shoulders and pushed her down into the bed. A.D. had her legs together, while defendant's knees were on the outside of her legs. A.D. tried to wiggle away, but defendant told her to stop. Eventually, A.D. was able to break free and get away. This incident made A.D. feel "[r]eally bad and mad." A.D. did not immediately tell anyone because she was afraid that she would get in trouble and get spanked by Crystal. There was a time when A.D. did not remember what happened to her, but she was eventually able to remember.

### *Law Enforcement Investigation*

In 2014, Officer Moore of the Bakersfield Police Department was contacted by law enforcement in Washington State regarding disclosures made by S.M. Officer Moore attempted to speak with C.D., A.D, and D.D., but none of them wanted to speak with him. Officer Moore believed defendant was living at the residence at the time he attempted to speak with the three children.

Sergeant Davenport of the Bakersfield Police Department also conducted an investigation into defendant and the disclosures made by S.M. In 2014, Sergeant Davenport was assigned to the Special Victims Unit, which handled child-related crimes, sexual abuse, and physical abuse. Sergeant Davenport contacted the various law enforcement agencies involved and made sure C.D., A.D., and D.D. were interviewed. He also interviewed B.S.

6.

Detective Garrett of the Bakersfield Police Department became involved in the investigation in 2017. Detective Garrett received a report from the Taft Police Department, which resulted in C.D., A.D., and D.D. all being placed in protective custody for reasons unrelated to the instant case. Detective Garrett then scheduled a forensic interview of the three children to be conducted by a social worker. The interviews were all video recorded and Detective Garrett was able to personally observe the interviews without the children's knowledge. After the interviews, Detective Garrett asked follow-up questions to all three children. During the interview, C.D. and D.D. were able to identify defendant, however, A.D. was not.

During A.D.'s interview, she was reluctant to talk with the social worker and appeared to be nervous and anxious. A.D. described an occasion where defendant performed an act of oral copulation and told A.D. to pretend it was a lollipop. A.D. also stated defendant put his front part on her front part and her bottom. A.D. drew a picture and described herself lying on the bed while defendant was standing at the foot of the bed with his front part touching her front part. During this incident, defendant held open A.D.'s legs. After the incident, A.D. described seeing white dots all over her body, except on her face. The white dots disappeared after two days.

D.D. was also interviewed. D.D. initially could not remember anything happening to her, however, she did remember defendant made her and her sisters orally copulate him. D.D. stated it happened almost every night. Defendant made D.D. pretend his penis was chocolate because D.D. liked chocolate.

In November 2017, Detective Garrett recorded an interviewed with S.M. over the telephone. S.M. reported that she did not disclose everything in 2014 because "she was in a state of shock." S.M. stated that, during the first incident, her sisters were playing video games in the bedroom while Crystal was working. S.M. was wearing shorts and a pajama top. Defendant then started touching S.M. inappropriately. Defendant slid her shorts to the side and penetrated her. S.M. described it as "his manhood entering her

7.

womanhood." Defendant also touched S.M. with his hands over and under her clothing, including on her vagina. During the incident, C.D. was asleep on the bed.

After the incident, S.M. began having pain in her vaginal area, including spotting or slight bleeding. S.M. tried to tell Crystal, but the conversations did not go well. Crystal "kind of got angry at [S.M.], like, bringing things up." S.M. told Detective Garrett defendant had sexual intercourse with her two to three times. The other incidents involved "unwanted touching."

### Dr. Michael Musacco's Testimony

Dr. Musacco, a licensed psychologist, testified for the prosecution as an expert in CSAAS. He did not talk with the prosecutor about the case, nor was he aware of any of the facts surrounding the alleged abuse. Dr. Musacco testified CSAAS is a theory or an explanation for how and why children behave in certain ways when they have been sexually abused.

Dr. Musacco testified there are five stages to CSAAS. The first stage is secrecy which means there is an individual who commits this crime and there is a victim who has been victimized and it is kept secret. The second stage is helplessness meaning a child often experiences shame and confusion and are emotionally overwhelmed after being sexual abused. The third stage is accommodation. A victim can become rebellious and act out. The child victim can become suicidal or make statements of self-harm. On the other end of the spectrum, child victims can become the perfect child and start taking over the mother's role in the family. The fourth stage is delayed or unconvincing disclosure. A victim will often wait months or years, or even until adulthood before they disclose abuse. Dr. Musacco went on to testify that if a parent shuts down the child, it is less likely the child will disclose. The final stage – which is less empirically supported – is retraction. This occurs when the child discloses the abuse, but then changes the story and states, " 'This never occurred. I made it up for this or that reason.' "

On cross-examination, Dr. Musacco acknowledged false allegations, although rare, do occur. False allegations are more typical in a scenario where "mom and dad are fighting over custody of their children." Moreover, he did acknowledge, without grooming, it is rare for an incident of child abuse to start off with penetration. However, he testified this type of scenario does occur.

**Defense Case-In-Chief**

### *Detective Garrett's Testimony*

Detective Garrett interviewed C.D. when she was 11 years old. He stated C.D. appeared to be emotional when she was talking to him. Detective Garrett showed C.D. a picture of defendant and she had somewhat of a grimace, but not necessarily a smile. C.D. asked Detective Garrett if she could take a picture of defendant's photo. Detective Garrett also testified regarding D.D.'s interview with the social worker. He testified D.D. was not immediately aware of the reason for the interview and did not immediately suggest that anything had happened to her or her sisters. The social worker was the first to mention defendant's name, and the social worker repeatedly used the phrase, " 'You sucked his d[**]k.' "

### *C.D.'s Testimony*

Between 2013 and 2014, C.D. lived in Bakersfield, California, with her three sisters and defendant. C.D. and S.M. were very close. When C.D. was seven or eight years old, S.M. told her something happened with defendant causing S.M. to talk with law enforcement. Two and a half years later, C.D. told Officer Martinez of the Taft Police Department defendant had raped her in a park. Specifically, C.D. told Officer Martinez defendant pulled her over by the bathrooms and raped her behind a bush. C.D. later admitted she lied.

On cross-examination, C.D. testified although she lied, she did tell the truth about other incidents between her and defendant. Between 2013 and 2014, defendant raped C.D. between three to four times. When she was raped, C.D. would lie down, and

9.

defendant would be on top of her. C.D. also testified that on one to two occasions, defendant touched her vagina with his hands. Moreover, defendant made C.D. orally copulate him. These incidents would occur at night in both her room and Crystal's room. After the incidents, C.D. had pain in her legs, arms, forearms, and thighs. C.D. also testified she did not tell Officer Martinez or anyone all the details surrounding the abuse because she was scared.

### Officer Martinez's Testimony

Officer Martinez talked with C.D. regarding a possible rape. C.D. told him defendant raped her in a park in Taft, California. C.D. stated defendant grabbed her and pulled her for 50 to 60 yards before he raped her. Officer Martinez believed C.D. was not telling the truth because the park she identified can have between 40 to 60 people at any given time. Officer Martinez then told C.D. there were cameras in the park. C.D. eventually told Officer Martinez she lied. On cross-examination, Officer Martinez testified that C.D. told him defendant had raped her two years prior while living in Bakersfield, California.

### Deputy Benavidez's Testimony

In 2014, Deputy Benavidez was a detective with the Thurston County Sheriff's Department in Washington State. During that time, Deputy Benavidez interviewed S.M. Deputy Benavidez asked S.M. about what she told her mother and S.M. replied, " 'Not really much.' " S.M. told Deputy Benavidez she had no recollection of any sexual penetration, and she would fall asleep and then wake up in pain with her clothes either off or in some disheveled position. Deputy Benavidez then asked her, " '[W]hat do you believe happened while you were sleeping,' " and S.M. responded, " 'That either [defendant] had raped me or I was just imagining the whole thing, which is very doubtful.' " At the end of the interview, Deputy Benavidez asked, " '[W]here did [defendant] touch you at that night?' " and S.M. replied, " 'Um, I'm not really quite sure if he touched me at all.' "

On cross examination, Deputy Benavidez acknowledged he was aware S.M. had disclosed, to another deputy, defendant forced her to have sex with him. Moreover, S.M. stated that defendant had touched her " '[l]ots of times.' " S.M. also stated that defendant started to undress her, and she got really nervous and passed out. S.M. would then wake up in a lot of pain in her vagina with her sweatpants no longer on. S.M. tried " 'screaming, but nothing came out and [she] ended up passing out.' " S.M. also described an incident on the couch where defendant touched her on the breasts. Lastly, S.M. told Deputy Benavidez that she was scared of defendant.

### Nurse Lisa Wahl's Testimony

Nurse Lisa Wahl worked at as a forensic nurse at Providence St. Peter Hospital Sexual Assault Clinic and Child Maltreatment Center in Lacey, Washington for 13 years. On October 31, 2014, Nurse Wahl examined S.M. She also recorded a 50-minute interview with S.M. During the interview, S.M. described going to sleep and waking up in pain. S.M. never described any penetration, but stated she felt pain outside her vagina for a month. Nurse Wahl testified a child reporting vaginal pain for a month could be psychosomatic. S.M. told Nurse Wahl her urine had started changing color after the incident. Nurse Wahl testified bladder infections cause the color of one's urine to change color. She also testified she did not find any evidence of a breaking of the hymenal tissue in S.M.'s vagina. However, Nurse Wahl testified there is a higher chance of observing physical evidence of trauma closer to the abuse and there is a 2.3 to five percent chance there will be actual vaginal findings. She testified most incidents do not cause significant physical trauma.

### Braden R.'s Testimony

Braden R. lived with defendant, Crystal, and the children during the time the alleged abuse occurred. Braden was 17 years old at that time. Braden testified that defendant appeared to get along with the children and was very respectful. Braden was unaware of any type of abuse by defendant. However, on cross-examination, Braden

11.

acknowledged he was out of the house three to four nights a week at his girlfriend's residence. Further, Braden spent the majority of his time at the house during the daytime.

### *Defendant's Testimony*

Defendant testified on his own behalf. He testified he never sexually abused the children.

## Prosecution Rebuttal Evidence

Detective Garrett testified on rebuttal regarding a conversation he had with defendant in January 2018. Defendant never indicated Braden lived at the house, and defendant could not remember the children's names. Defendant also stated that on some occasions A.D. would come over and crawl into bed with him because he was a "cuddler."

Sergeant Davenport testified on rebuttal that as of January 2015, C.D., A.D., and D.D. were no longer living with Crystal at the house.

## DISCUSSION

Defendant contends the trial court prejudicially erred in instructing the jury with CALCRIM No. 1193 because CALCRIM No. 1193 inaccurately states the law. Specifically, defendant argues that "[b]y allowing the jurors to consider the CSAAS testimony in evaluating the complaining witness's 'believability,' CALCRIM [No.] 1193 effectively circumvents [*People v. Housley* (1992) 6 Cal.App.4th 947] and permits the jurors to consider the expert testimony as supporting the truth of the allegations made against the defendant." According to defendant, the instruction effectively lessened the prosecution's burden of proof and "allow[ed] the jury to draw an impermissible inference of guilt in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution." We disagree.

## I.     Forfeiture

As an initial matter, the People contend defendant has forfeited his challenge on appeal regarding CALCRIM No. 1193 because he did not object in the trial court.

12.

Defendant contends that, although his counsel did not object, this court should still consider the instructional error claim because the CALCRIM No. 1193 instruction is incorrect in law. We conclude that even if trial counsel failed to object to the instruction in the trial court, we would still be required to consider the merits of his claim.

A defendant forfeits a claim of instructional error by failing to object to the instruction in its entirety or request any modification or amplification of it at trial. (*People v. Lee* (2011) 51 Cal.4th 620, 638.) "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*Ibid*.) However, when a defendant asserts that an instruction is incorrect in law, an objection is not required. (*People v. Capistrano* (2014) 59 Cal.4th 830, 875, fn. 11, overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 103–104.)

Here, the record does not reflect defendant objected to CALCRIM No. 1193 or requested an instruction modification. However, we will consider the issue in light of defendant's claim that the giving of CALCRIM No. 1193 was incorrect in law. (See *People v. Capistrano*, *supra*, 59 Cal.4th at p. 875, fn. 11.)

## II.    CSAAS Jury Instruction (CALCRIM No. 1193)

Defendant contends that CALCRIM No. 1193's use of the phrase "believability" is flawed because there is no practical distinction between saying a victim is believable versus saying their testimony is true. Specifically, by allowing the jurors to consider CSAAS testimony in evaluating the victim's "believability," defendant contends CALCRIM 1193 permits the jurors to consider the expert testimony as supporting the truth of the allegations made against defendant. We conclude that CALCRIM No. 1193 is legally correct and does not violate due process.

### A.    *Additional Factual Background*

Prior to Dr. Musacco's testimony, the jury was instructed as follows:

13.

"Now, ladies and gentlemen, before you hear the testimony of Dr. Musacco, I have an instruction that will give you some guidance in how to absorb this testimony and evaluate this testimony. I will also read this to you when I read the bulk of the law to you at the conclusion of the evidence, but I would like to read this one particular instruction at or about the time that you receive this particular kind of testimony because it's somewhat unique.

"Ladies and gentlemen, you will hear testimony from Dr. Michael Musacco regarding child sexual abuse accommodation syndrome. Dr. Musacco's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.

"You may consider this evidence in deciding whether or not the alleged victims' conduct was consis – was not inconsistent – let me state that again.

"You may consider this evidence in deciding whether or not the alleged victims' conduct was not inconsistent with the conduct of someone who has been molested in evaluating the believability of her testimony.[5]

"Again, you're going to have this with you when you go into the jury deliberation room, but that is some information to help you understand what this testimony is offered for and how you may utilize that testimony.

"And I'll explain to you before you begin deliberations if you have any questions about any of the evidence or any of the law, how you'll communicate that to the Court."

Before jury deliberation, the trial court again instructed the jury as follows:

---

**5** In the instruction preceding Dr. Musacco's testimony, the trial court failed to inform the jury that it could consider this evidence "*only* in deciding" whether the victim's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the victim's believability. However, prior to deliberation, the trial court provided the jury with the full and correct instruction. (See *People v. Prieto* (2003) 30 Cal.4th 226, 255 ["[T]he misreading of a jury instruction does not warrant reversal if the jury received the correct written instructions"].) The trial court also instruct the jury to "[c]onsider the final version of the instructions in [its] deliberations." (See *People v. Mills* (2010) 48 Cal.4th 158, 200 [court gives precedence to the written instructions, particularly where the jury is instructed its deliberations are to be governed by the instructions in their final form].)

14.

"You have heard testimony from Dr. Michael Musacco regarding child sexual abuse accommodation syndrome. Dr. Michael Musacco's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.

"You may consider this evidence only in deciding whether or not Jane Doe 1, 2, or 3's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

## B.     *Standard of Review*

"We review instructional error claims under a de novo standard of review." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 175 (*Lapenias*).) "The proper test for judging the adequacy of instructions is to decide whether the trial court 'fully and fairly instructed on the applicable law ….' " (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) We assess the instructions as a whole and view the challenged instruction in context with other instructions to determine whether there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. (*People v. Jennings* (2010) 50 Cal.4th 616, 677.) As our Supreme Court articulated, "[w]e presume that jurors understand and follow the court's instructions." (*People v. Pearson* (2013) 56 Cal.4th 393, 414.) "The California jury instructions approved by the Judicial Council are the official instructions for use in the State of California." (Cal. Rules of Court, rule 2.1050, subd. (a).)

## C.     *Discussion*

"[I]n all cases in which an expert is called to testify regarding CSAAS … the jury must sua sponte be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*People v. Housley, supra*, 6 Cal.App.4th at p. 959.) CSAAS evidence "is not admissible to prove that the

15.

complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident – e.g., a delay in reporting – is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin*, *supra*, 53 Cal.3d at p. 1300.)

"Courts have held the pattern jury instruction[6] accurately informs the jury on the limited use of CSAAS evidence, but the instruction does not: (a) improperly allow an alleged minor victim of sexual abuse to corroborate her own testimony; (b) violate due process; or (c) misapply the burden of proof." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 175, citing *People v. Munch* (2020) 52 Cal.App.5th 464, 473–474 (*Munch*); *People v. Gonzalez* (2017) 16 Cal.App.5th 494, 503–504 (*Gonzalez*).)

In *Gonzalez,* the appellant argued "it is impossible to use the CSAAS testimony to evaluate the believability of [the victim's] testimony without using it as proof that [the appellant] committed the charged crimes." (*Gonzalez*, *supra*, 16 Cal.App.5th at p. 503.) The court found the "instruction must be understood in the context of [the expert's] testimony." (*Ibid*.) The expert testified "[t]he purpose of CSAAS is to understand a child's reactions when they have been abused." (*Id*. at p. 504.) Therefore, "[a] reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the victim's] behavior does not mean she lied

---

**6** CALCRIM No. 1193 states the following:

"You have heard testimony from _____ *<insert name of expert>* regarding child sexual abuse accommodation syndrome.
"_____'s *<insert name of expert>* testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her) [or any conduct or crime[s] with which (he/she) was not charged]
"You may consider this evidence only in deciding whether or not _____'s *<insert name of alleged victim of abuse>* conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

when she said she was abused." (*Ibid*.) "Thus, under CALCRIM No. 1193, a juror who believe[d] [the expert's] testimony will find both that [the victim's] apparent self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Ibid*.) Therefore, "CALCRIM No. 1193 was proper and did not violate due process." (*Ibid*.)

Similarly, in *Munch*, the appellant "contend[ed CALCRIM No. 1193] reduces the prosecution's burden of proof because it 'effectively instructs the jury that they may take [the expert's] testimony as evidence of the defendant's guilt.' [The appellant] claim[ed] instructing jurors that they may use it 'in evaluating the believability' of the child's testimony means they will improperly use it to find the defendant is guilty." (*Munch*, *supra*, 52 Cal.App.5th at p. 474.) The court found the trial court did not err in giving CALCRIM No. 1193 because "[i]t also gave a separate instruction during trial that the jurors could not consider CSAAS evidence as proof that [appellant] committed the charged crimes." (*Munch*, at p. 474.) "The combination of that instruction with CALCRIM No. 1193 would not provide any reasonable juror grounds to believe CSAAS evidence could be used in the way [the appellant] suggests." (*Ibid*.) Moreover, the court held the instruction does not violate due process. (*Id*. at p. 470.)

We find both *Gonzalez*, *supra*, 16 Cal.App.5th 494 and *Munch*, *supra*, 52 Cal.App.5th 464 persuasive and conclude CALCRIM No. 1193 does not violate due process, nor does it allow CSAAS testimony to be used as proof the underlying charge is true. To the contrary, the instruction expressly prohibits the jury from using this evidence for this purpose. Therefore, it is not reasonably likely the jury understood CALCRIM No. 1193 as allowing it to use CSAAS evidence to determine the molestation occurred or that the victims' molestation claims were true. The only reasonable interpretation of the instruction is the jury may use CSAAS evidence in evaluating the believability of the witness's claims in light of the evidence they engaged in conduct inconsistent with the

17.

conduct of a child who had been molested. The instruction does not mislead the jury into using CSAAS evidence for the impermissible purpose of determining that, because a witness exhibits stages of CSAAS evidence, the defendant is guilty.

Nonetheless, defendant contends *Gonzalez*, *supra*, 16 Cal.App.5th 494 and *Munch*, *supra*, 52 Cal.App.5th 464 were wrongly decided. Defendant argues CALCRIM No. 1193 is flawed because "if jurors are permitted to use CSAAS evidence to conclude that the victim did not lie when she said she was abused, that is the same as permitting them to conclude that the victim told the truth, and that in turn is tantamount to allowing them to conclude from the CSAAS testimony that the defendant is guilty." We reject this argument for the reasons stated in *Gonzalez* and *Munch*. (*Gonzalez,* at p. 504; *Munch* at p. 474.)

Defendant also argues CALCRIM No. 1193 is insufficient to inform the jury of the limitations of CSAAS evidence when compared with CALJIC No. 10.64. CALJIC No. 10.64 provides:

> "Evidence has been presented to you concerning [child sexual abuse accommodation] [rape-trauma] syndrome. This evidence is not received and must not be considered by you as proof that the alleged victim's [molestation] [rape] claim is true.

> "[[Child sexual abuse accommodation] [Rape trauma] syndrome research is based upon an approach that is completely different from that which you must take to this case. The syndrome research begins with the assumption that a [molestation] [rape] has occurred, and seeks to describe and explain common reactions of [children] [females] to that experience. As distinguished from that research approach, you are to presume the defendant is innocent. The People have the burden of proving guilt beyond a reasonable doubt.]

> "You should consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with [him] [her] having been [molested] [raped]."

18.

CALJIC No. 10.64 provides information regarding CSAAS that is not contained in CALCRIM No. 1193. Although CALCRIM No. 1193 does not include a discussion about assumptions underlying CSAAS evidence, the omission of CALJIC No. 10.64's additional language was immaterial. As stated above, CALCRIM No. 1193 properly informed the jury regarding the limited purpose of the evidence. Accordingly, "the official jury instruction accurately instruct[ed] the jury on the law: the proper use – and the proper limitations on the use – of CSAAS evidence." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 176.) Therefore, there was no instructional error.[7]

Additionally, we assess the instructions as a whole and view the challenged instruction in context with other instructions to determine whether there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. (*People v. Jennings*, *supra*, 50 Cal.4th at p. 677.) Here, the jury was instructed to "[p]ay careful attention to all of these instructions and consider them together" (CALCRIM No. 200) and "certain evidence was admitted for a limited purpose" (CALCRIM No. 303). Moreover, the trial court instructed the jury, "You alone must judge the credibility or believability of witnesses," (CALCRIM No. 226), and "You must consider the [expert] opinions, but you are not required to accept them as true or correct" (CALCRIM No. 332). Therefore, the jury was properly instructed, apart from CALCRIM No. 1193, to consider the CSAAS evidence and Dr. Musacco's testimony for its limited purpose.

Lastly, there is no reasonable likelihood the prosecutor's comments during closing argument regarding CALCRIM No. 1193 would have caused the jury to misunderstand or misapply the instruction. (See *People v. Jennings, supra,* 50 Cal.4th at p. 677.) The prosecutor argued the jury should consider the credibility and believability of S.M., A.D.,

---

[7] Because we find no instructional error, we need not, and do not, consider the issue of prejudice. (*People v. Alexander* (2010) 49 Cal.4th 846, 873 [no occasion to consider prejudice where there is no showing of error].)

and D.D., and should think about the four stages of CSAAS. The prosecutor did not argue the CSAAS evidence could be used to verify the truth of the underlying charges, but rather argued the CSAAS evidence simply informed the jury about child sexual assault victims' behavior in these types of situations.

In sum, CALCRIM No. 1193 accurately states the law. Moreover, there was not a reasonable likelihood the jury misapplied CALCRIM No. 1193 because the other instructions adequately guided the jury in the use of CSAAS evidence for its limited purpose and the prosecutor's statements during closing argument about the CSAAS testimony did not confuse the jury.

## DISPOSITION

For the foregoing reasons, the judgment is affirmed.


POOCHIGIAN, ACTING P. J.

WE CONCUR:


FRANSON, J.


SMITH, J.